**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MICHAEL ANTHONY VANLUE,**

**Plaintiff,**

**vs.**                                                           **CIVIL ACTION NO. 2:16-01499**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social

Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II

and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§

401-433, 1381-1383f. By Standing Order entered January 12, 2016 (Document No. 4.), this case

was referred to the undersigned United States Magistrate Judge to consider the pleadings and

evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all

pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-

Motions for Judgment on the Pleadings. (Document Nos. 11 and 12.)

The Plaintiff, Michael Anthony Vanlue (hereinafter referred to as "Claimant"), filed an

application for DIB and an application for SSI on December 28, 2012 (protective filing date),

alleging disability as of December 5, 2012[1], due to irritable bowel syndrome (IBS), depression,

anxiety, weight loss and joint problems. (Tr. at 220.) Claimant's applications were denied initially

---

[1] The ALJ's decision states that the alleged onset date is January 1, 2010. (Tr. at 12, 13.) Claimant stated that he
stopped working in September 2009 due to "joint problems" and "started physical therapy" and attempted to go back
to work in late 2012, but quit working on December 5, 2012. (Tr. at 209.)

1

on March 13, 2013 (Tr. at 89-98.) and upon reconsideration on May 20, 2013. (Tr. at 100-105.) On July 8, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 106-107.) The hearing was held on July 18, 2014, before the Honorable Harry C. Taylor, II. (Tr. at 24-42.) By decision dated September 17, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-23.) The ALJ's decision became the final decision of the Commissioner on December 18, 2015 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On February 12, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether

the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(C) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant had met the requirements for insured worker status through June 30, 2013. (Tr. at 14, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, January 1, 2010. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from right shoulder impingement and depression, severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform medium work as defined in the regulations

"except he could have minimal contact with the public and restricted use of the right upper extremity for overhead duties." (Tr. at 18, Finding No. 5.)

At step four, the ALJ found that Claimant was unable to perform past relevant work. (Tr. at 21, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was twenty-six years old as of the onset date of disability, which is defined as a younger individual. (Id. at Finding No. 7.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id. at Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Tr. at 21, Finding No. 9; Tr. at 22, Finding No. 10.) On this basis, benefits were denied. (Tr. at 23, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on March 26, 1983, and was 31 years old at the time of the administrative hearing, July 18, 2014. (Tr. at 21.) Claimant had at least a high school education[3], and was able to communicate in English. (Tr. at 21.) He previously worked as a fast-food prep-cook and cook, an electrical installer, and a laborer. (Tr. at 21.)

<u>The Medical Record</u>

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Records pre-dating Claimant's alleged onset date of December 5, 2012:</u>

On May 3, 2010, Claimant had a cyst from his upper right back removed. (Tr. at 285, 289.) Claimant had a follow up appointment after surgery on May 10, 2010 that indicated the wound was healing; he was given 10 Lortabs for pain and advised no more pain medications would be given. (Tr. at 277.) There were nurse notations that indicated Claimant requested more pain medication, which were refused. (Tr. at 279-281.) An x-ray taken of Claimant's lumbar spine on May 20, 2010 was unremarkable. (Tr. at 402.) Because of his complaints of chronic neck pain, on May 25, 2010 an x-ray was taken of Claimant's cervical spine; it was normal. (Tr. at 401.); an MRI of Claimant's neck taken on July 16, 2010 found no abnormalities. (Tr. at 397.) An MRI of

---

[3] Claimant obtained his GED after having quit formal schooling in the tenth grade. (Tr. at 221.)

Claimant's lumbar spine on August 28, 2010 indicated no abnormal findings. (Tr. at 391.) A chest x-ray indicated no cardiopulmonary disease, though bronchovascular markings consistent with tobacco abuse were noted on January 6, 2011. (Tr. at 369.) Due to complaints of right shoulder pain, scapula pain, chest pain and shortness of breath, another x-ray of Claimant's chest was taken on March 17, 2011; impression was "nonacute" findings. (Tr. at 394.) Additional chest x-rays taken on March 28, 2011 due to Claimant's chronic cough and congestion showed no significant changes from the images taken on January 6, 2011. (Tr. at 392.) On March 25, 2011, Claimant returned with complaints of right shoulder pain and decreased range of motion; an x-ray indicated "underlying prominence of the distal clavicle at the low point", but "no signs of any fracture subluxation or dislocation." (Tr. at 275.) Dr. Joseph Darrow, M.D. diagnosed him with anterior impingement syndrome right shoulder. (Tr. at 276.) Dr. Darrow recommended that Claimant take anti-inflammatories on a regular basis, with exercises, and a cortisone injection, instead, Claimant requested narcotics and Tramadol which the physician refused. (Id.)

On April 4, 2011, Claimant complaints of pain in his right shoulder continued, and he complained of multiple joint pains; x-rays were negative for fracture or dislocation, but he had significant grinding in the right shoulder and decreased range of motion. (Tr. at 293.) On April 8, 2011, an MRI taken of the right shoulder was normal, and Claimant was recommended to continue physical therapy with anti-inflammatories; Claimant advised that therapy was not helping, and his requests for pain medications were refused. (Tr. at 291-294.) By May 12, 2011, Claimant had full range of motion, but was still tender. (Tr. at 291.)

From July 26, 2011 through September 6, 2011, Claimant had physical therapy to treat his right shoulder pain at Mountain River Physical Therapy. (Tr. at 295-321.) On July 28, 2011, it was

noted that Claimant had achieved full right shoulder flexion. (Tr. at 300.) On August 1, 2011, Claimant complained of intermittent soreness, but denied any new complaints. (Tr. at 302.) On August 15, 2011, Claimant complained of increased neck and back discomfort and still felt the grinding sensation when laying on his side; nevertheless, progress was noted in his mobility during therapy. (Tr. at 307.) On August 22, 2011, Claimant reported he had had a migraine headache for four days and continued to have difficulty sleeping on his right side while his left side was also locking up intermittently. (Tr. at 310.) He was noted to have significant improvement scapulothoracic joint mobility caudally, with restrictions in his right shoulder superiorly, and moderate to severe tenderness in the right levator scapulae. (Id.)

By August 31, 2011, Claimant reported having more frequent headaches and no improvement in his right shoulder discomfort despite increased range of motion. (Tr. at 315.) He indicated pain in the area where his cyst had been removed in 2010. (Id.) by September 6, 2011, Claimant reported minimal pain in his right upper extremity but began to describe shooting pains down his left upper extremity. (Tr. at 317.) On examination, improving scapulothoracic mobility on the right side was noted, though restricted with crepitus and discomfort; range of motion was normal. (Id.)

From September 29, 2011 to April 18, 2013, Claimant was treated for bilateral shoulder pain at Camden Clark Internal Medicine Clinic. (Tr. at 408-417.) Initially, Claimant had good range of motion with negative scratch tests, however, both shoulders were positive for crepitus; he was prescribed Skelaxin, Ultram, and Lyrica with trigger point injections planned for next visit. (Tr. at 417.) On October 13, 2011, Claimant reported that Lyrica seemed to help, and was assessed with joint pain in right shoulder, anxiety and tobacco abuse. (Tr. at 415.) It was considered that

Claimant had a small tear in rotator cuff that was missed by the MRI or could represent referred pain from the cervical area to the shoulder, due to his symptoms; range of motion was still good. (Id.)

By November 28, 2011, Claimant reported all over joint pains, with decreased range of motion in his neck and painful paraspinal musculature with palpitation. (Tr. at 414.) He was assessed with chronic thoracic pain, chronic headaches, and neuropathic pains, prescribed an increase in Ultram and Lyrica, and referred for bloodwork and an MRI of his thoracic spine and brain. (Id.) By reports dated March 29, 2012, Claimant's rheumatoid arthritis factor and sedimentation rate were within normal limits, and his anti-nuclear antibodies screen was negative. (Tr. at 326-328.) On April 25, 2012, Claimant complained of a swollen right testicle[4], chronic widespread pain, fatigue, low energy, "mental fog," and chronic headaches, and was noted to be tender at T5, T6, and T7 levels and in the paraspinal musculature. (Tr. at 413.) He was assessed with chronic pain syndrome/fibromyalgia and depression. (Id.)

By June 25, 2012, a physical examination of systems was all normal, except for Claimant's right testicle. (Tr. at 412.) He was assessed with fibromyalgia, chronic musculoskeletal pain, depression, anxiety, and right testicular swelling. (Id.) Cymbalta was switched to Lexapro. (Id.) At his next visit on November 16, 2012, Claimant reported that he was back to work at McDonald's, and that his pain was well controlled with Ultram, but he still had right testicle swelling. (Tr. at 411.) He lost his medical card and could not fill his Lexapro prescription, and tried Celexa, but did

---

[4] Previously, on March 20, 2012, Claimant went to the emergency room at St. Joseph's Hospital in Parkersburg due to pain and swelling in his right testicle; on his "Adult Health History Questionnaire" he denied having symptoms of depression, anxiety, or hopelessness. (Tr. at 377.) Claimant had a history of bilateral hydroceles and hernia, and was diagnosed with gross hematuria. (Tr. at 370-387.) Claimant underwent a cystoscopy, bilateral pyelograms, and urethral dilation which revealed mild diffuse trabeculations in the bladder, but was otherwise unremarkable. (Tr. at 370.) Later on October 10, 2013, he underwent a hydrocelectomy. (Tr. at 436.)

not notice much difference; he felt stable without antidepressants. (Id.) Again, he was assessed with fibromyalgia/chronic musculoskeletal pain; depression; and tobacco abuse. (Id.)

Records post-dating Claimant's alleged onset date of December 5, 2012:

On December 11, 2012, Claimant presented to the emergency room with complaints of neck and upper back pain he sustained in a four-wheeler crash. (Tr. at 323.)

By January 24, 2013, Claimant reported left shoulder pain after taking deep breaths and increased pain in his left shoulder blade. (Tr. at 410.) He was assessed with left subscapular trigger point, fibromyalgia/chronic pain syndrome, tobacco abuse, and insomnia. (Id.) On April 18, 2013, Claimant returned with no other complaints except that he was not sleeping well and that extended release medications were not working, Trazadone made him groggy the next day. (Tr. at 409.) Ultram was increased. (Id.) On December 18, 2013, Claimant reported he was not tolerating the Tramadol as well as he had  been and was experiencing an increase in thirst and a  decrease in appetite, and it was no longer controlling his pain and causing him difficulties in his daily activities. (Tr. at 435.) Ultram was discontinued and morphine sulfate was prescribed instead; for Claimant's depression, a referral was made to Westbrook at his request. (Id.)

On December 30, 2013, Claimant presented to Westbrook for an intake assessment. (Tr. at 423-428.) On January 31, 2014, under the supervision of Amelia McPeak, M.D., Gongqiao Zhang, PA-C, diagnosed Claimant with major depressive disorder, recurrent, severe, without psychotic features, with anxious distress and anger issues, possibly due to physical and psychological pain syndrome, marijuana use disorder, musculoskeletal dysfunction, shoulder blades and ribcage pain, chronic pain. (Tr. at 421.) Claimant's mental status examination revealed cooperative attitude with normal behavior, intact memory, attention and concentration, with fair insight and judgment. (Id.)

Claimant was prescribed Pristiq; prognosis was guarded due to Claimant having the symptoms for many years. (Tr. at 422.) Claimant did not show for his next two appointments. (Tr. at 418.)

On February 12, 2014, Claimant had a recheck on his fibromyalgia with Dr. Matthew Day, D.O., and reported no complaints; Claimant stated his pain was well controlled on extended release morphine and that his qualify of life and functionality had improved. (Tr. at 429.) There were no psychiatric problems noted, such as depression, anxiety, sleep problems, concentration, confusion, stress, headaches or nervousness. (Id.) He had a normal gait, station, strength, and tone with no atrophy, spasm, or tremors. (Tr. at 430.) Returning on May 7, 2014 for another recheck with Dr. Michael Cheshire, D.O., Claimant reported that the morphine was doing quite well, except for breakthrough pain in the morning. (Tr. at 447.) He had a normal gait, station, and posture, and normal strength and tone with no atrophy, spasticity, or tremors. (Tr. at 446.) Though Claimant's fibromyalgia was usually treated with narcotics, Dr. Cheshire set a goal to use newer therapy such as Cymbalta, Effexor, exercise, and to wean him off narcotic medications. (Tr. at 447.) On June 18, 2014, another recheck on his fibromyalgia with Dr. Day, Claimant again denied any complaints; his pain was well controlled on the extended release morphine; his quality of life and functionality had improved; and his wife noticed an improvement in his daily activities. (Tr. at 441.) Claimant presented no psychiatric problems, though he still had back pain, cramps, weakness or numbness, as well as breakthrough pain in the morning and evening, and requested an increase in his morphine dosage; he was then referred to pain management. (Tr. at 441-443.)

State Agency Medical Consultant

On March 7, 2013, State agency physician Fulvio Franyutti, M.D. reviewed Claimant's medical records and opined that he remained able to perform a range of light work with occasional

climbing ramps/stairs, balancing, kneeling, crouching, crawling (no climbing ladders, ropes, and scaffolds), with limited reaching right in front and/or laterally, and right overhead, and that avoided concentrated exposure to cold/heat and moderate exposure to hazards. (Tr. at 50-52, 60-62.) Dr. Franyutti opined Claimant could lift and carry 20 pounds occasionally and less than 10 pounds frequently but was limited in his ability to push and/or pull in the right upper extremity. (Tr. at 50, 60.) Dr. Franyutti further opined that Claimant could sit, stand, or walk about six hours in an 8-hour workday. (Tr. at 50, 60.) On May 20, 2013, Thomas Lauderman, D.O. reviewed the file and reached the same conclusions as Dr. Franyutti. (Tr. at 70-72, 80-82.)

State Agency Psychological Consultant

On March 13, 2013 G. David Allen, Ph.D. did not find that the medical record evidence established a mental impairment. (Tr. at 48-49, 58-59.) On May 17, 2013, James W. Bartee, Ph.D. also found that the medical record evidence did not establish a mental impairment. (Tr. at 68-69, 78-79.)

George Bell, M.D., Medical Expert

Dr. Bell testified at the administrative hearing concerning Claimant's mental impairments: depression and substance abuse (marijuana), and opined that neither would equal or meet Listing criteria. (Tr. at 28-29.) Dr. Bell opined that Claimant was mildly impaired in activities of daily living; moderately impaired in social functioning because Claimant has difficulty with anger and he does not get along with others; and moderately impaired in concentration, persistence, or pace, mainly in concentration which is affected by his chronic depression and distraction because of the pain. (Tr. at 29.) Dr. Bell opined that Claimant's limitations as a result of these would be minimal contact with others, and a 15-minute rest period every two hours. (Id.)

13

<u>Judith Brendemuehl, M.D., Medical Expert</u>

Dr. Brendemuehl testified at the administrative hearing concerning Claimant's physical impairments, and opined that the records showed numerous instances of Claimant requesting narcotics, but the objective evidence did not support Claimant's allegations of pain. (Tr. at 31.) Dr. Brendemuehl testified that Claimant's diagnosis of fibromyalgia was not established in the record under Social Security regulations and the American College of Rheumatology requirements from 2010 such as serologic testing to exclude other rheumatological disorders and 16 of 18 trigger or tender points. (Tr. at 32.) Dr. Brendemuehl disagreed with Dr. Bell's finding that a 15-minute rest period every two hours was necessary from a physical standpoint. (Tr. at 33.) Dr. Brendemuehl testified that there were no x-ray or MRI evidence to substantiate the audible grinding in Claimant's right shoulder, though the increased muscle tension in the medial scapular area was a positive trigger point supportive of a physical finding to support some pain. (Tr. at 34-36.)

<u>Casey Vass, Vocational Expert</u>

Mr. Vass testified that Claimant's past relevant work as a fast food cook and electrical installer was classified as medium, and as a laborer, heavy, unskilled. (Tr. at 38.) The ALJ asked the VE to consider the following hypothetical:

> I'd ask you then two [sic] hypothetically consider an individual as in the present case, with education, training, and work experience – he would have been 20 at his onset, with a GED and work experience as mentioned. And assuming I should find that he suffers from a major depressive disorder along with some pain, all of which would create some restrictions and limitations, and that there should be minimal contact with the public. And he's going to have difficulty performing overhead duties with his right upper extremity. (<u>Id</u>.)

In response, the VE named jobs at the medium, light, and sedentary levels. (Tr. at 38-39.) Claimant's attorney asked the VE to add to the ALJ's hypothetical that the individual would be

limited to minimal contact with coworkers and supervisors. (Tr. at 40.) The VE responded the jobs would remain if minimal contact could be maintained; however, if the individual could not no contact with a supervisor, there would be no jobs available. (Tr. at 40.) The VE further confirmed that the named jobs would remain even with a limitation to no more than occasional overhead reaching with the right upper extremity. (Tr. at 40-41.) When asked if this limitation was extended to include occasional reaching overhead and all directions, the VE explained all of the named jobs would be precluded except the surveillance system monitor. (Tr. at 41.) Finally, the VE testified that an employer would not tolerate an individual who was off-task more than 10 percent of an eight-hour work day in an unskilled job. (Id.)

<u>Claimant's Pain Questionnaire and Adult Function Report</u>

Claimant did not testify during the administrative hearing, but provided statements in response to the SSA's request for information. (Tr. at 238-250.) Dated January 27, 2013, Claimant completed a pain questionnaire and indicated that he has pain that lasts "all day, every day" "all over in joint, worst from chest and up" that he described as aching, stabbing, cramping, throbbing, crushing, and grinding. (Tr. at 238, 239, 240.) Claimant alleged that the pain makes him "sick and dizzy" and makes him cry "thinking about it", but has found that "Tramadol helps the most so far." (Id.) He listed three medications he took for pain: Tramadol, which sometimes relieves the pain; Trazodone, which never relieves the pain; and Tramadol ER, which sometimes relieves the pain; he denied these medications caused side effects. (Tr. at 239, 240.) He states that the pain leaves him unable to move out of bed, ride a bike or run and play with his daughter. (Tr. at 240.) He explained that if he "look[s] up or down for more than a few minutes", his neck "locks up" and "pops", and he would get an immediate headache. (Tr. at 241.)

15

On February 5, 2013, Claimant completed his Adult Function Report. (Tr. at 243-250.) He stated that he is unable to work by doing repetitive "movements for as little as ten minutes because of [his] bones smash[ing] and grin[d]ing causes nauseating pain, blackouts, and chronic muscle spas[m]s." (Tr. at 243.) Daily, he will wake up around 7:00 am and take his first dose of his medication, get dressed and take his daughter to school at 7:40 am, and when he returns home, he will go back to sleep until around 12:30 pm, (Tr. at 244.) and later take his second dose, which tends to help a little bit more. (Tr. at 250.) He will sometimes eat lunch around 2:00 pm, clean his cat's litter box, and go pick up his daughter from school around 2:45 pm. (Id.) Afterwards, he will help his daughter do homework, and make dinner, every other night he will help his daughter take a bath. (Id.) He also feeds and waters his pet. (Tr. at 244.) He does get assistance with these activities from his wife and mother-in-law. (Id.) He sleeps more during the day than at night, and can dress and feed himself and use the toilet normally. (Id.) Claimant states that he bathes about once per week because scrubbing or washing hurts; he keeps his hair short so he does not have to wash as hard; and he shaves once every two weeks because holding up his arms is difficult. (Id.) Sometimes his wife will help him wash himself. (Tr. at 245.) Claimant stated that he used to enjoy cooking, but only does it for his daughter. (Id.) He vacuums his apartment twice a week, with encouragement from his wife and child, but the repetitive movement is painful and is more painful by the next day. (Tr. at 245-246.) Claimant can drive alone, and prefers to drive because he gets "anxiety as a passenger." (Tr. at 246.) He does not shop (Id.) or spend time with others. (Tr. at 247.)

He is able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. at 246.)  He plays on his smartphone but cannot work on cars or electronics due to his hands. (Tr.

at 247.) Claimant states he is easily agitated and did not get along with others or socialize. (Tr. at 248.) He indicated he could lift five pounds and walk approximately three blocks before needing to rest, but had difficulties with squatting, standing, sitting, or kneeling and could not reach with his arms or bend. (Id.) He stated he is unable to concentrate or understand well because he is always trying to block the pain out. (Id.) He can pay attention for less than five minutes and has to reread written instructions "over and over throughout the cooking process"; regarding how well he does with spoken instructions, he stated he has to see instructions rather than hear them. (Id.) With regard to how he gets along with authority figures, Claimant stated he felt that everyone was against him. (Tr. at 249.) Claimant stated that if it required a lot of movement, then and he does not handle changes in his routine well. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the ALJ failed to properly evaluate his fibromyalgia under SSR 12-2p at each step of the sequential evaluation, even if he did determine this impairment non-severe. (Document No. 11 at 14-16.) This error was caused by the ALJ's heavy reliance on the testimony of Dr. Judith Brendemuehl, M.D., who failed to consider that Claimant's diagnosis was made in accordance with the 2010 American College of Rheumatology Preliminary Diagnostic criteria for Fibromyalgia. (Id. at 14.)

Under SSR 12-2p, a claimant can establish a medically determinable impairment of fibromyalgia when a physician has diagnosed fibromyalgia according to either the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic criteria. Id. The 1990 ACR Criteria require (1) a history of widespread pain that may fluctuate in intensity; (2) at least 11 positive tender points on physical

examination; and (3) evidence that other disorders were excluded. Id. The 2010 ACR Criteria require (1) a history of widespread pain; (2) repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, such as cognitive or memory problems, depression, anxiety, or irritable bowel syndrome; and (3) evidence that other disorders were excluded.  Once a claimant has established he has the medically determinable impairment of fibromyalgia, the Commissioner will apply the five-step sequential evaluation to determine whether the claimant is disabled. Id.; see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). (Id. at 14-15.)

> Claimant proffers the testimony of Dr. Brendemuehl to make his case on this issue:

> And as far as the fibromyalgia is concerned, first of all, if you look at the Social Security Regulations with regard to fibromyalgia, if we're looking at the American College of Rheumatology requirements from 2010, those require documentation of serologic testing to exclude other rheumatological disorders. I really couldn't find those in this record. Sixteen of eighteen trigger points or tender points need to be documented. We don't have that.

(Id. at 15.)

Claimant contends that contrary to Dr. Brendemuehl's opinion, the requirements make no mention of the specific serologic tests or require sixteen of eighteen trigger points. (Id.) Plus, Dr. Brendemuehl's statement that she found no documentation of serologic testing is factually inaccurate, because the record has documentation of serologic testing. (Id. at 16.) The ALJ's reliance on this faulty opinion was evident at step two of the sequential evaluation, when he determined Claimant's diagnosis of fibromyalgia was not a severe impairment. (Id.) This finding was a harmful error that continued into the RFC assessment on the basis of the lack of objective evidence to substantiate Claimant's symptoms. (Id.) This error was further carried into the ALJ's incomplete hypothetical to the vocational expert, who was not asked to consider Claimant's symptoms, which the ALJ justified to deny the claim. (Id.)

Next, Claimant argues that the ALJ's giving Dr. Brendemuehl's opinion "great weight" was in violation of 20 C.F.R. §§ 404.1527(c),(e),416.927(c),(e) since the doctor failed to abide by 2010 ACR Criteria due to her inadequate review of the record evidence; this error was also evident when the ALJ discounted Dr. Bell's opinion. (Id. at 17-18.)

Finally, Claimant argues that the ALJ failed to account for his finding that Claimant had moderate difficulties in concentration, persistence or pace in the RFC, without an explanation for this omission and without posing a hypothetical to the VE with this limitation, which requires remand pursuant to Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). (Id. at 18-20.)

The Commissioner responds that the ALJ did properly consider Claimant's fibromyalgia pursuant to SSR 12-2p. (Document No. 12 at 7-10.) SSR 12-2p explains that a claimant can establish a medically determinable impairment of fibromyalgia by providing evidence from a licensed physician with a diagnosis of fibromyalgia, and by providing "the evidence we describe in Section II.A or Section II.B," where the physician's diagnosis is not inconsistent with the other evidence in the person's case record." SSR 12-2p, 2012 WL 3104869, at *2-3. (Id. at 7-8.) Then, "[o]nce we establish that a person has a [medically determinable impairment] of [fibromyalgia], we will consider it in the sequential evaluation process to determine whether the person is disabled." Id. (Id. at 8.)

It is undisputed that Claimant did not meet the 1990 criteria, as he only had one trigger/tender point (not the required 11 tender points). (Id. at 8.) Claimant's own prior counsel admitted this at the administrative hearing. (Id.) The Commissioner argues that Claimant did not even meet all three 2010 criteria: there is no history of widespread pain, the first criterion, which was noted by Dr. Brendemuehl. (Id. at 9.) The Commissioner states that Claimant's focus on the

other two criteria still falls short of a medically determinable impairment of fibromyalgia as defined by SSR 12-2p. (Id. at 9-10.)

The Commissioner notes that the ALJ did not render a step two decision but instead, proceeded to assess Claimant's RFC, taking into consideration all of his alleged impairments. (Id. at 10.) The Commissioner argues that when an ALJ finds that a claimant has at least one severe impairment and proceeds with the sequential evaluation process, the failure to consider whether any other impairment qualifies as severe is harmless error pursuant to Mauzy v. Astrue, 2010 WL 1369107, at *3-6 (N.D.W.Va. 2010) (unpublished). (Id.) The Commissioner contends that the ALJ complied with 20 C.F.R. §§ 404.1523, 416.923 when he considered the combined effects of all of Claimant's alleged impairments, regardless of whether the impairment was severe or non-severe. (Id.)

Next, the Commissioner contends that the ALJ properly evaluated Dr. Brendemuehl's opinion pursuant to 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii); HALLEX §§ 1-2-5-32, 1-2-5-34(A). (Id. at 10-12.) The ALJ explained why he gave great weight to Dr. Brendemuehl's testimony regarding Claimant's fibromyalgia because it was supported by the record in accordance with SSR 96-6p, 1996 WL 374186. (Id.)

Finally, the Commissioner contends that the RFC properly considered Claimant's mental limitations and argues the holding in Mascio supports the ALJ's RFC. (Id. at 12-15.) The ALJ reviewed the evidence of Claimant's mental limitations and ultimately found him capable of work in spite of the limitations. (Id. at 12-13.) The Commissioner points out that the Mascio Court looked to other Circuits which contemplated that an ALJ properly assesses an RFC to include mental limitations in concentration, persistence or pace when the hypothetical is restricted to work

involving simple routine tasks. (Id. at 13.) The Commissioner argues that the ALJ considered Claimant's moderate limitation in concentration, persistence or pace which was supported by the testimony of the impartial medical expert, Dr. Bell, who testified that Claimant's mental limitations would translate into a functional limitation requiring a 15-minute rest period every two hours. (Id. at 14.) The ALJ explained that this limitation providing for a 15-minute rest period every two hours was not supported by the evidence of record and thus given little weight. (Id. at 15.) Finally, the Commissioner asserts that the unskilled occupations identified by the VE accommodated this limitation. (Id.)

Claimant replies that the Commissioner's argument regarding the ALJ's evaluation of fibromyalgia is a post hoc explanation which a reviewing court is admonished to engage in, and is to only review the explanations provided in the ALJ's decision.[5] (Document No. 13 at 1-3.) The ALJ did no such analysis in formulating the RFC or explained the limitations therein and there is no reference in the decision that Claimant's fibromyalgia was considered in the RFC assessment. (Id. at 3.) Next, Claimant reasserts that the ALJ did not comply with 20 C.F.R. §§ 404.1527 and 416.927 in evaluating the opinion of Dr. Brendemuehl; great weight was given to this opinion which was based on mistakes of fact and omissions of the medical evidence, thus the ALJ's decision was not based on substantial evidence. (Id. at 4.)

Analysis

The issues at hand concern three main areas in which Claimant contends the ALJ erred:

---

[5] See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); see also Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 50 (1983), citing Burlington Truck Lines Inc. v. United States, 371 U.S. 151, 168 (1962); Luster v. Astrue, 2011 WL 2182719 (D.S.C. 2011); Tanner v. Astrue, 2011 WL 2313042 (D.S.C. 2011). Radford v. Colvin, 734 F.3d 288 (4th Cir. 2013) (remand to agency for additional investigation or explanation proper if reviewing court has no way of evaluating basis for ALJ decision); Fox v. Colvin, 632 Fed.Appx. 750 (4th Cir. 2015).

first is whether the ALJ appropriately evaluated Claimant's fibromyalgia under SSR 12-2p; next is whether the ALJ complied with the Regulations evaluating the opinion of Dr. Judith Brendemuehl, M.D., a non-examining impartial medical consultant; finally, is whether the ALJ made a defective RFC assessment by not including his findings of Claimant's moderate difficulties in concentration, persistence or pace in contravention to controlling case law.

<u>Fibromyalgia under SSR 12-2p</u>

Social Security Ruling, SSR 12-2p provides guidance on the evidence required to establish a medically determinable impairment of fibromyalgia pursuant to either the 1990 ACR Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria. 2012 WL 3104869, at *2. Under the 1990 ACR Criteria, a medically determinable impairment of fibromyalgia is found so long as an individual meets all three of the following:

1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination.[6] The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.

3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia]. Therefore, it is common in cases involving [fibromyalgia] to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor.)

---

[6] The 18 tender point sites are located at the: occiput; low cervical spine; trapezius muscle; supraspinatus muscle; second rib; lateral epicondyle; gluteal; greater trochanter; and inner aspect of knee. <u>Id</u>., at *3.

Id., at *2-3.

The 2010 ACR Criteria provides that for an individual to have a medically determinable impairment of fibromyalgia, all three of the following must be shown: (1) a history of widespread pain[7]; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome[8]; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.[9]

There appears to be no dispute that one of the necessary criterion from the 1990 ACR Criteria was not met: the ALJ noted only one trigger (tender) point was noted in the records, at the left subscapular area (Tr. at 15.), and Claimant's attorney at the administrative hearing noted this as well. (Tr. at 27, 33-34.) Because at least 11 tender points must be positive on physical examination, clearly 1990 Criteria are not met.

Regarding the 2010 Criteria, Dr. Brendemuehl testified that under the Social Security regulations[10], fibromyalgia was not established by the record, and opined that treatment for fibromyalgia with narcotics was inappropriate. (Tr. at 32, 37.) On that note, the ALJ acknowledged Dr. Brendemuehl's testimony was consistent with the evidence. (Tr. at 15.) Claimant has argued that Dr. Brendemuehl's opinion is further flawed based on her testimony that she "really couldn't find" serologic testing that included "things like sed rate, CRP, rheumatoid factor", which is

---

[7] This is the same criterion as that required under 1990 ACR Criteria. Id.
[8] The ALJ noted that Claimant alleged irritable bowel syndrome on his Disability Report, there was no diagnosis of this impairment in the record. (Tr. at 16.)
[9] Again, this is the same criterion as that required under 1990 ACR Criteria. Id.
[10] The undersigned agrees with Claimant that Dr. Brendemuehl misstated the necessary number of trigger or tender points, and notes that this criterion is required under the 1990 ACR Criteria.

required under the third criterion for the 1990 or 2010 Criteria, where the record showed that Claimant did indeed have such testing. (Document No. 11, at 15-16.) The ALJ, however, acknowledged that Claimant had testing for rheumatoid arthritis factor, sedimentation rate, and ANA screen, and noted the results were normal. (Tr. at 19.) Despite the shortcomings in the evidence supporting a proper finding of fibromyalgia as a medically determinable impairment under SSR 12-2p, at step two in the sequential evaluation process the ALJ noted Claimant's fibromyalgia diagnosis as a medically determinable impairment, though found it was not severe because it caused no significant limitation in his ability to function, as Claimant responded well to narcotics treatment, and his treating physician "set a goal of attempting newer therapy, which included non-narcotic medication and exercise. (Tr. at 15, 19.) It is undisputed that the ALJ does not expressly refer to SSR 12-2p in his decision, however, given his review of the evidence in the decision, and the testimony of Dr. Brendemuehl at the administrative hearing, it appears that the ALJ was aware of the Ruling's requirements[11], including how fibromyalgia, which he considered a non-severe impairment, should be treated further on in the sequential evaluation. See, 2012 WL 3104869, at *5-6. Though the ALJ did not refer to fibromyalgia by name, he did review the effects of this non-severe impairment, by addressing the lack of objective medical evidence, and Claimant's pain being well-controlled with extended release morphine. (Tr. at 19.)

Interestingly, there has been no evidence or argument that suggests Claimant has a medically determinable impairment of fibromyalgia pursuant to SSR 12-2p; the ALJ's alleged error is couched in terms of reliance on and evaluation of an expert's opinion who made misstatements of SSR criteria and made an oversight in the medical records that still did not support a medically

---

[11] See, generally, Burger v. Colvin, 2015 WL 5347065, at *10 (W.D. Va. Sept. 14, 2015).

determinable impairment of fibromyalgia pursuant to SSR 12-2p. This alleged error is a red-herring, as the decision indicates that the ALJ followed regulatory evaluation procedures with regard to Claimant's non-severe impairment of 'fibromyalgia' which included the allegations of symptoms and the effects of treatment.

<u>Evaluation of Dr. Judith Brendemuehl's opinion</u>

Claimant contends that the ALJ's assigning "great weight" to the opinion of Dr. Brendemuehl expressly because her opinion was consistent with the evidence of record, despite her misstated requirements under 1990 and 2010 Criteria, and her failure to acknowledge Claimant had certain tests she believed were required under that Criteria is contrary to 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). (Document No. 11, at 17-18.) The ALJ did afford her opinion great weight, specifically with regard to the lack of objective evidence supporting Claimant's allegations of disabling pain, to his narcotic seeking behavior noted in the medical records, and to his treating physician's intention to wean Claimant off narcotics and placed on medications more suitable for fibromyalgia. (Tr. at 20-21.) Claimant's reliance on Dr. Brendemuehl's misstatements during the administrative hearing does nothing to alter the fact that there was insufficient objective medical evidence to qualify Claimant's allegations of chronic, disabling pain, or that his more recent treating physician wanted to wean him off narcotics to more appropriate treatment, though the medical records indicated the narcotics were successful in controlling his pain. The ALJ gave credit to Dr. Brendemuehl's opinion where it was substantiated by the record evidence, which was undisputed; there is no evidence that the ALJ credited Dr. Brendemuehl's misstatements of SSR 12-2p requirements or her single oversight of Claimant's serologic testing. Indeed, the ALJ noted that Claimant's rheumatoid arthritis factor was less than

8.6, his sedimentation rate was within normal limits, and ANA screen was negative. (Tr. at 19.) The ALJ's affording great weight to an opinion that was "supported" by and "consistent" with the indisputable medical evidence is not contrary to 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

RFC Assessment

Claimant asserts that at step three of the sequential evaluation, the ALJ found Claimant had moderate difficulties in social functioning and in concentration, persistence, or pace, but the only mental limitation in the RFC assessment was that Claimant "could have minimal contact with the public" which fails to fully address Claimant's limitations; plus, the ALJ failed to include this moderate difficulty in the hypothetical to the VE, and failed to explain why it was not included much like the situation denounced in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). (Document No. 11 at 19.)

At steps four and five of the sequential analysis, an ALJ must determine a claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545, 416.945. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical

and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1546, 416.946.

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a per se rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be

considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

With regard to concentration, persistence or pace, the ALJ found that Claimant exhibited moderate difficulties:

> He indicated that he could not follow instructions. He reported he does not need reminders for taking medication or appointments. He noted that he drives because he becomes anxious as a passenger. He indicated he could manage finances. Although he indicated he could pay attention for less than five minutes, he reported that he plays on his smart phone "more than anything," and finishes what he starts such as chores, reading, and watching movies. (Exhibit 6E)

(Tr. at 17.) The ALJ found Claimant's impairments did not satisfy either "paragraph B" or "paragraph C" criteria, and further found that the psychological opinion of Dr. Bell was consistent with these findings. (Id.) During the administrative hearing, with regard to

28

Claimant's functional limitations from his mental impairments, the ALJ inquired of Dr. Bell:

> Q.     Would there be any kind of limitations?
>
> A.     Yeah. The limitation would be minimal contact with others, and I think he would require like a 15-minute rest period every two hours.

(Tr. at 29.) At this step in the sequential evaluation, the ALJ gave "great weight" to Dr. Bell's opinion because it was supported by the mental health records from Westbrook. (Tr. at 17.)

At the RFC assessment step, the ALJ properly performed the two-step process required to assess Claimant's symptoms with the objective medical evidence, and due to Claimant's statements regarding the intensity, persistence and functional limitations of his symptoms, the ALJ found them not entirely credible. (Tr. at 18.) First, the ALJ addressed Claimant's allegations of disabling symptoms and limitations caused by his right shoulder impingement, the only severe physical impairment. (Id.) The ALJ noted that the Claimant's allegations were greater than what could be substantiated by the clinical evidence and treatment notes: x-rays and MRIs of his cervical and lumbar spine were normal; physical therapy notes indicated good range of motion in upper extremities; musculoskeletal examination findings were normal; pain was reportedly well-controlled with extended release morphine; and he reported improvement in his quality of life and functionality, which was echoed by his wife. (Tr. at 18-19.) The ALJ found Claimant had no side effects from his medication, based on Claimant's report. (Tr. at 19.)

With regard to Claimant's allegations of disabling limitations caused by his depression, the only severe mental impairment, the ALJ identified several records from March 2012, November 2012, and December 2013 wherein Claimant reported no complaints or limitations related to this

impairment. (Id.) The ALJ noted that the psychiatric review in December 2013 was normal, though Claimant requested a referral to Westbrook for his depression, and he failed to continue with his psychological treatment, that the ALJ described as "suggesting that the symptoms may not have been as serious as has been alleged in connection with this application and appeal". (Tr. at 19-20.) The ALJ examined Claimant's allegations contained in his Function Report and compared them to the treatment notes: "Although the claimant reported he could not pay attention for more than five minutes, he reported helping his daughter with her homework"; at Westbrook a "mental status examination revealed memory, attention, and concentration were intact with fair insight and judgment. He was cooperative with normal behavior." (Tr. at 20.) Though the record shows discrepancies with Claimant's alleged onset date, the ALJ noted that Claimant's sporadic work history, and medical records from late 2012 raised a question as to whether Claimant's unemployment is due to medical impairments. (Id.)

Regarding Claimant's mental impairment, the ALJ found that Claimant's allegations indicated the presence of depression, which was corroborated by Dr. Bell's opinion, however, the ALJ gave little weight to Dr. Bell's opinion that Claimant needed a fifteen-minute rest period every two hours due to pain because of the lack of evidence in the record. (Id.) Regarding Claimant's physical impairment, the ALJ gave great weight to Dr. Brendemuehl's opinion because the records corroborated her opinion, and further, the ALJ found that the record contained no opinion from Claimant's examining or treating physicians that found him disabled or limited by his diagnoses. (Tr. at 21.) Nevertheless, the ALJ accommodated right upper extremity limitations, despite the more recent records showing improvement. (Id.) Dr. Bell testified that the limitations caused by Claimant's mental impairments were "minimal contact with others" and "a 15-minute rest period

30

every two hours". (Tr. at 29.) The ALJ accommodated this mental impairment by placing him in a work environment where he would have "minimal contact with the public". (Tr. at 18.) As mentioned above, the ALJ explained why he discounted Dr. Bell's fifteen-minute rest period limitation, which is permissible under the Regulations.

It is important to note that in Mascio, the Court determined that nowhere did "the ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's residual functional capacity." 780 F.3d at 640. It was this "lack of explanation," the Court held, which "requires remand." Id.[12]

The RFC assessed in this case does not present the errors that would necessitate remand under Mascio, or demonstrate a deviation from the procedural standards set forth in the Regulations. The ALJ properly considered the entire medical record, including Claimant's statements, the expert testimony, and resolved the conflicts in the evidence, that supported the RFC. (Tr. at 21.) Since the ALJ's analysis did not contain "inadequacies … [that] frustrate meaningful review" with regard to the RFC assessment, the decision, finding Claimant not disabled, contained sufficient explanation and therefore, is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the

---

[12] The facts of Mascio is a case study of an ALJ decision rife with error: there were conflicting RFC assessments by two State agency consultants, the ALJ's findings were more consistent with one, but did not mention it, and the ALJ's discussion of the other trailed off at the point of weighing the evidence; the RFC was lacking in analysis for meaningful review; and of grave importance, the ALJ assessed the claimant's credibility after the RFC in contravention of the Regulations.

Defendant's Motion for Judgment on the Pleadings (Document No. 12.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 6, 2016.

Omar J. Aboulhosn
United States Magistrate Judge